IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KRISTI DAVIS, formerly known as Kristi Howard, ) ) ) | |
| Plaintiff, ) ) | |
| vs. ) ) | Case No. CIV-18-118-D |
| The BOARD OF COUNTY COMMISSIONERS OF STEPHENS COUNTY, a political subdivision of the State of Oklahoma, ) ) ) ) ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff, Kristi Davis, f/k/a Kristi Howard ("Davis" or "Plaintiff"), for her causes

of action against Defendant Board of County Commissioners of Stephens County, a

political subdivision of the State of Oklahoma ("Board" or "Defendant"), alleges and

states:

### THE PARTIES

1. Davis is and at all relevant times herein was a citizen of the State of Oklahoma and

   resident of Stephens County, Oklahoma. Stephens County is located in the Western

   District of Oklahoma.

2. The Board is a political subdivision of the State of Oklahoma with its principal place

   of business in Stephens County, Oklahoma.

1

## JURISDICTION AND VENUE

3. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because all of the causes of action in this Complaint arise under federal law.

4. This Court has personal jurisdiction over the Board because it is a political subdivision of the State of Oklahoma.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the acts and/or omissions giving rise to this lawsuit occurred in the Western District of Oklahoma and the Board is located in the Western District of Oklahoma.

## FACT ALLEGATIONS

6. Davis began her employment with the Board as a part-time employee at the Stephens County Fairgrounds ("the Fairgrounds") located in Duncan, Oklahoma in or around November 2011.

7. In or around January 2016, Davis became a full-time employee at the Fairgrounds.

8. The Fairgrounds are a multi-use complex that host a wide range of indoor and outdoor events year round.

9. In or around early July 2016, Davis was working at the Fairgrounds alongside male coworkers Shannon Lane ("Lane"), Caleb Willeford ("Willeford"), and another man.

10. While standing next to Davis, Lane noticed a cat walking outside of the building and told Davis that "your pussy is hungry."

11. Davis responded "dude that was not cool" and walked away. Willeford agreed with Davis and walked away. The other man also walked away.

12. Lane's clearly inappropriate comments made Davis unsafe and uncomfortable, necessitating Davis to go to the main office at the Fairgrounds and speak with Donna Kelly ("Kelly"), the Fairgrounds' secretary.

13. Davis told Kelly about Lane's comments. Kelly noted that she could tell Davis was physically upset by Lane's comments. Kelly then reported what Davis had told her to Mike Anderson ("Anderson"), the facility director of the Fairgrounds.

14. On the following day, David McCarley ("McCarley"), a county commissioner for Stephens County, came to the Fairgrounds to meet with the Fairgrounds employees regarding sexual harassment. McCarley said that the Board would not tolerate sexual harassment.

15. During McCarley's visit, all employees present had to sign in, acknowledging their presence at the sexual harassment meeting.

16. Lane was ordered to not come to the Fairgrounds for the remainder of the week. Lane returned to work at the Fairgrounds the following Monday.

17. Following the incident involving Lane and the sexual harassment meeting led by McCarley, many of the male employees present at the Fairgrounds actively alienated and refused to cooperate with Davis in any way while working near or alongside her. The male employees actively alienated Davis and refused to help Davis complete work assignments and tasks, despite a clear duty and need to do so.

18. Davis's immediate supervisor was Lyndol Brosh ("Brosh"), a male who was the grounds manager. Brosh and Davis are distant cousins.

19. Before starting the work day, Davis would often go to Brosh's office at the Fairgrounds to review the daily calendar with Brosh to see what tasks needed to be completed on a given day.

20. After Davis's male coworkers began alienating her and obstructing her job performance, Davis complained to Brosh. Brosh was uncooperative and told Davis that her male coworkers were afraid of her. Brosh did nothing to remedy Davis's concerns. Instead, Brosh ratified the conduct that Davis complained of.

21. On one morning in October 2016, Davis walked into Brosh's office to discuss the daily calendar and tasks. While reviewing the daily calendar, Brosh told Davis that he had a dream about Davis, and that in his dream, Davis was "a really good kisser."

22. Davis told Brosh that they were related and that his statements were inappropriate. Davis left Brosh's office.

23. On or about November 15, 2016, Davis was replacing floor tiles in the men's bathrooms at the Fairgrounds. Davis called for Brosh because she needed assistance. Brosh entered the bathroom and told Davis, "you know, I had another one of those dreams last week. Nothing too exciting. We just kissed."

24. Davis became nervous and felt physically unsafe because she was alone in the bathroom with Brosh. Davis diverted the conversation back to completing tile placement under the urinals.

4

25. Following the incident in the men's bathroom, Davis felt uncomfortable being in confined spaces with Brosh. Thus, when Davis would go by Brosh's office to review the daily calendar, she would only stand in the doorway while speaking with Brosh.

26. On or around the morning of December 20, 2016, Davis went by Brosh's office to review the daily calendar. While speaking with Davis, Brosh told Davis that he had another dream about her and that "they went all the way and it was great." Davis walked away from Brosh's office.

27. On or around December 22, 2016, Davis went into the men's bathroom at the Fairgrounds to fix a broken stall door. Brosh followed Davis into the bathroom. Brosh cornered Davis, put his arms around her, and told her that if she had anything to say, she could "come to him."

28. Brosh continued his inappropriate and harassing behavior by sending unsolicited sexually suggestive text messages to Davis, repeatedly calling Davis at all times of the day, and by coming by Davis's home uninvited.

29. On or around January 31, 2017, Davis reported Brosh's behavior to Anderson. Davis told Anderson that Brosh's behavior was making her very uncomfortable while working at the Fairgrounds.

30. On or around February 1, 2017, Anderson reported Davis's complaint to Todd Churchman ("Churchman"), a Stephens County commissioner.

31. On or around February 2, 2017, Anderson contacted Davis and asked if she would speak with Justin Scott ("Scott"), an investigator for the Stephen's County District Attorney's Office.

32. Davis prepared a letter dated February 2, 2017 to Scott, outlining some of her concerns about the inappropriate and harassing behavior she experienced at the Fairgrounds.

33. On or around February 2, 2017, Davis met with Scott. Davis told Scott the details of the inappropriate and harassing behavior she experienced at the Fairgrounds. Scott told Davis that he would look into Davis's concerns and speak with Anderson and Brosh. Davis asked Scott what she should do in the meantime. Scott responded that he or someone else on behalf of the County would be in touch with Davis.

34. Following February 2, 2017, Davis used her accumulated vacation time, sick leave, comp time, and straight time to take leave from working at the Fairgrounds while Scott and/or other personnel with the Board investigated and addressed the Brosh situation. Given Brosh's numerous unwanted verbal and physical advances on Davis, Davis no longer felt physically safe working alongside Brosh at the Fairgrounds.

35. While Davis was using her various accumulated leave hours, she regularly kept in touch with Anderson to determine the status of Brosh and his ability to return to work at the Fairgrounds. Anderson told Davis that he was being "kept in the dark" on those matters.

36. On or around February 13, 2017, Brosh was formally terminated by the Board. This information was not relayed to Davis by Scott or the Board.

6

37. While Davis was awaiting the resolution of the Brosh matter by the Board and/or the Stephen's County District Attorney's Office, Davis began working at ASAP General Stories in Duncan.

38. Following Brosh's termination, Davis went to the Equal Employment Opportunity Commission ("EEOC") on or around February 17, 2017. Davis provided information of the aforementioned events at the Fairgrounds to Wendy Trefethren, an EEOC investigator. Davis also completed an intake questionnaire concerning the aforementioned events.

39. On or around March 6, 2017, Churchman approached the Stephen's County District Attorney's Office to inquire about how to terminate Davis, despite Davis's record of hard work and outstanding performance.

40. On or around March 13, 2017, Davis was formally terminated by the Board. Davis did not receive any type of notice regarding her termination hearing or the Board's agenda on the same.

41. Davis filed her Charge of Discrimination with the EEOC on or around September 14, 2017.

42. The EEOC issued a Notice of Suit Rights on or around November 15, 2017.

43. Accordingly, Davis has exhausted her administrative remedies, timely filed her Charge of Discrimination, and timely filed the instant lawsuit.

44. At all relevant times, the Board was an "employer" as defined in Title VII of the Civil Rights Act of 1964, as amended and the Fair Labor Standards Act ("FLSA").

7

As such, the Board is subject to the requirements of Title VII and the FLSA, including the Equal Pay Act of 1963 (29 U.S.C. § 206(d)).

## FIRST CAUSE OF ACTION: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED – RETALIATION

45. Davis incorporates ¶¶ 1-44 as though fully stated herein.

46. Davis is in a protected class because she is a female and because she engaged in protected activities under Title VII by, *inter alia*: (1) complaining to her supervisors about harassment multiple times; (2) by speaking with Stephen's County District Attorney's Office about her subjection to inappropriate harassment by her male coworkers; and (3) by contacting the EEOC on or around February 17, 2017 to complain about the various forms of inappropriate treatment she experienced at work.

47. Davis at all times performed her job duties in a satisfactory manner.

48. Davis was treated less favorably than others employed by the Board not in her protected class and who did not engage in similar protected activity.

49. Davis was subjected to materially adverse actions in that, *inter alia*: (1) Davis was treated in an uncooperative, unkind, and intentionally obstructionist manner by multiple male employees of the Board who worked at and around the Fairgrounds following her complaint lodged against Lane up until her last day of work; (2) Brosh refused to help Davis or remedy her complaints of a hostile work environment and instead began harassing and eventually physically assaulting her; and (3) Davis was

8

terminated from her employment position at the Fairgrounds following her complaint lodged against Brosh.

50. An objectively reasonable employee in Davis's position would have regarded the aforementioned actions as materially adverse.

51. The aforementioned materially adverse actions caused Davis to suffer injuries rising to a level of seriousness.

52. The Board and its employees engaged in materially adverse actions against Davis because Davis engaged in the protected activities described herein.

53. The Board's stated reason for the materially adverse employment action is pretextual and not worthy of belief.

54. Following Davis's termination, her job was not eliminated.

55. As a direct result of the Board's discrimination as alleged herein, Davis has suffered economic loss, mental anguish, emotional distress, injury to her professional reputation, humiliation, embarrassment, sleeplessness, lost enjoyment of life, all to her damage in a sum in excess of Seventy-Five Thousand Dollars ($75,000.00).

WHEREFORE, Davis prays for judgment against the Board as follows:

    (a)    That the Board be ordered to make Davis whole by providing all the remedies and relief authorized by 42 U.S.C. § 2000e-5(g);

    (b)    That the Board be ordered to pay Davis economic and compensatory damages pursuant to Title VII in an amount to be determined by the jury at the time of the trial;

(c)     That the Board be ordered to reinstate Davis to the position and compensation package she held at the time of her termination or, in lieu of reinstatement, front pay for a period of years that the Court determines just, equitable, and sufficient to make Davis whole;

(d)     That the Board be ordered to pay Davis's costs including witness fees and a reasonable attorney's fee pursuant to 42 U.S.C. § 200e-5(k);

(e)     That the Board be ordered to pay pre- and post-judgment interest; and

(f)     For such other and further relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED – GENDER DISCRIMINATION

56. Davis incorporates ¶¶ 1-55 as though fully stated herein.

57. Davis is in a protected class because she is a female.

58. At all relevant times herein, Davis was qualified to perform the essential functions of her job at the Fairgrounds and performed her job duties in a satisfactory manner.

59. Davis was subjected to a hostile work environment at the Fairgrounds in that, *inter alia*: (1) multiple male employees who worked at or near the Fairgrounds treated Davis in an uncooperative, unkind, intentionally obstructionist manner following the time when Davis lodged her complaint against Lane; and (2) Brosh, Davis's supervisor, ratified the conduct complained of and sexually harassed and assaulted Davis regularly while at work at the Fairgrounds and through digital communications.

60. The hostile work environment was continuous from the time Davis lodged her complaint against Lane and lasted until Davis's last day of work at the Fairgrounds.

61. The hostile work environment was sufficiently severe or pervasive to alter the conditions of Davis's employment and to cause a change in Davis's physical and psychological well-being.

62. The hostile work environment experienced by Davis was not merely run-of-the-mill boorish, juvenile, or annoying behavior. Rather, it was objectively and subjectively hostile or abusive considering the frequency of the discriminatory conduct, its severity, its humiliating nature, its offensiveness, and the fact that it unreasonably interfered with Davis's work performance.

63. Davis and her male coworkers have been employed by the Board for jobs that require substantially equal skill, effort, responsibility, and are performed under similar working conditions.

64. Despite doing equal work, Davis was paid a lower wage than similarly-situated males employed by the Board.

65. Davis's gender was a significant and motivating factor in (1) the Board's decision to terminate Davis; (2) the Board's decision to compensate Davis at a lesser rate than her male counterparts who performed similar work; (3) the uncooperative, unkind, intentionally obstructionist behavior exhibited by male employees who worked at or near the Fairgrounds following the time when Davis lodged her complaint against Lane; and (4) Brosh's sexual harassment and assault of Davis.

66. Davis was generally treated less favorably than males employed by the Board.

11

67. The Board's stated reason for the materially adverse employment actions and for compensating Davis at a lesser rate than her male counterparts are pretextual and not worthy of belief.

68. The Board's treatment of Davis and the Board's violations of Davis's statutory rights were willful.

69. The Board acted maliciously, wantonly, and in conscious disregard of Davis's rights and the Board's statutory obligations.

70. Following Davis's termination, her job was not eliminated.

71. As a direct result of the Board's discriminatory acts as alleged herein, Davis has suffered economic loss, mental anguish, emotional distress, injury to her professional reputation, humiliation, embarrassment, sleeplessness, lost enjoyment of life, all to her damage in a sum in excess of Seventy-Five Thousand Dollars ($75,000.00).

WHEREFORE, Davis prays for judgment against the Board as follows:

(a)     That the Board be ordered to make Davis whole by providing back pay, reimbursement measured by the difference in the rate of pay received by Davis and the rate of pay of similarly-situated male coworkers of Davis paid in violation of Title VII, and all the remedies and relief authorized by 42 U.S.C. § 2000e-5(g) and/or any other applicable statutes;

(b)   That the Board be ordered to pay Davis economic and compensatory damages pursuant to 42 U.S.C. § 1981 in an amount to be determined by the jury at the time of the trial;

(c)   That the Board be ordered to reinstate Davis to the position and compensation package she held at the time of her termination or, in lieu of reinstatement, front pay for a period of years that the Court determines just, equitable, and sufficient to make Davis whole;

(d)   That the Board be ordered to pay Davis's costs including witness fees and a reasonable attorney's fee pursuant to 42 U.S.C. § 200e-5(k);

(e)   That the Board be ordered to pay pre- and post-judgment interest; and

(f)   For such other and further relief as the Court deems just and proper.

## THIRD CAUSE OF ACTION: VIOLATION OF THE EQUAL PAY ACT, 29 U.S.C. § 2006(d) *et seq.*

72. Davis incorporates ¶¶ 1-71 as though fully stated herein.

73. Davis and her male coworkers have been employed by the Board for jobs that require substantially equal skill, effort, responsibility, and are performed under basically the same working conditions.

74. Despite the aforementioned similarities with her male coworkers, Davis was paid a lower wage than her male coworkers.

75. The Board did not compensate Davis and her similarly situated male coworkers differently because of a seniority system, a merit system, a pay system based on quantity or quality of output, or a disparity based on factors other than gender.

76. The Board's treatment of Davis and the Board's violation of Davis's statutory rights were willful within the meaning of 29 U.S.C. §§ 206(d) and 215.

77. The Board acted maliciously, wantonly, and in conscious disregard of Davis's rights and the Board's statutory obligations.

78. Davis has suffered, and is now suffering, and will continue to suffer irreparable injury from the Board's actions.

WHEREFORE, Davis prays for judgment against the Board as follows:

(a) The Board be ordered to make Davis whole by providing back pay and reimbursement measured by the difference in the rate of pay received by Davis and the rate of pay of similarly-situated male coworkers of Davis, paid in violation of the Equal Pay Act;

(b) Grant to Davis related damages in an amount proved at the time of trial to be unpaid compensation for equal work within the meaning of the Fair Labor Standards Act;

(c) Award to Davis interest on any of the above amounts running on the unpaid wages unlawfully withheld;

(d) Award to Davis the costs of this action and a reasonable attorney's fee as provided by the Fair Labor Standards Act (29 U.S.C. § 216(b)) and 42 U.S.C. § 1988; and

(e) For such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED,

/s/ Geoffrey A. Tabor
Stanley M. Ward, OBA#9351
Woodrow K. Glass, OBA#15690

14

Barrett T. Bowers, OBA#30493
Jonathan M. Irwin, OBA#32636
Geoffrey A. Tabor, OBA#32880
Tanner B. France, OBA#33171
**WARD & GLASS, L.L.P.**
1601 N.W. 36th Street
Norman, OK 73072
405-360-9700 Phone
405-360-7902 Fax

**ATTORNEY'S LIEN CLAIMED**
**JURY TRIAL DEMANDED**